**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

JOHN J. CARNEY, IN HIS CAPACITY AS
COURT-APPOINTED RECEIVER, FOR
HIGHVIEW POINT PARTNERS, LLC;
MICHAEL KENWOOD GROUP, LLC; MK
MASTER INVESTMENTS LP; MK
INVESTMENTS, LTD.; MK OIL VENTURES
LLC; MICHAEL KENWOOD CAPITAL
MANAGEMENT, LLC; MICHAEL KENWOOD
ASSET MANAGEMENT, LLC; MK ENERGY
AND INFRASTRUCTURE, LLC; MKEI SOLAR,
LP; MK AUTOMOTIVE, LLC; MK
TECHNOLOGY, LLC; MICHAEL KENWOOD          Civil Action No.
CONSULTING, LLC; MK INTERNATIONAL
ADVISORY SERVICES, LLC; MKG-
ATLANTIC INVESTMENT, LLC; MICHAEL
KENWOOD NUCLEAR ENERGY, LLC;
MYTCART, LLC; TUOL, LLC; MK CAPITAL
MERGER SUB, LLC; MK SPECIAL
OPPORTUNITY FUND; MK VENEZUELA,
LTD.; SHORT TERM LIQUIDITY FUND I,
LTD.,

                    Plaintiff,

          v.

MORIS BERACHA; 4A STAR CORP.;             **JURY TRIAL DEMANDED**
BRADLEYVILLE LTD.; BRAVE SPIRIT LTD.;
DOBSON MANAGEMENT CORP.; EAST
COAST CONSULTANT CORP.; FRACTAL
FUND MANAGEMENT LTD.; FRACTAL
FACTORING FUND; FRACTAL L HOLDING
LTD.; FRACTAL P. HOLDING LTD.;
FRACTAL FACTORING II; HERMITAGE
CONSULTANTS INC.; LA SIGNORIA ASSETS
CORP.; NETVALUE STRATEGY, S.A.;
NORTHWESTERN INTERNATIONAL, LTD.;
ROWBERROW TRADING CORP.; and SUNNY
SERVICES CORP.,

                    Defendants.

---

## COMPLAINT

John J. Carney, Esq. (the "Receiver"), as Receiver to The Michael Kenwood Group, LLC (the "MK Group") and certain affiliated entities (the "Receivership Entities")[1] in *Securities and Exchange Commission v. Illarramendi*, *Michael Kenwood Capital Management, LLC et al. C.A.*, No. 3:11-cv-00078 (JBA), (the "SEC Action") by and through his undersigned counsel, alleges the following:

## SUMMARY OF CLAIMS

1.      For nearly five years, Moris Beracha ("Beracha") and his affiliated entities, described below, (the "Defendants") participated in numerous, suspect transactions with Francisco Illarramendi ("Illarramendi") and the Receivership Entities.  Beracha and these affiliates received exorbitant fees, excessive and outlandish rates of interest, kickbacks and other improper payments.  Beracha and his entities received this money as Beracha knowingly served as Illarramendi's source of liquidity to perpetuate Illarramendi's Ponzi scheme and pay debts and redemptions as they came due.  Beracha's funding came in various forms, including the loaning of money for short periods of time at annual interest rates often exceeding 80%, and the introduction to Illarramendi of investors and important Venezuelan government officials,

---

[1] The Receivership Entities include: Highview Point Partners, LLC; MK Master Investments LP; MK Investments, Ltd.; MK Oil Ventures LLC; The Michael Kenwood Group, LLC; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC ("MKAM"); MK Energy and Infrastructure, LLC ("MKE&I"); MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC; MK Special Opportunity Fund ("SOF"); MK Venezuela, Ltd. ("MKV"); and Short Term Liquidity Fund I, Ltd. ("STLF").

bankers and financiers who could engage in transactions with Illarramendi.  Beracha provided the money or access to money that kept Illarramendi and his scheme afloat.

2.      Beracha was intimately involved with Illarramendi's business operations and knew or should have known that he was actively participating in and substantially facilitating and enabling a fraud and Illarramendi's breach of his fiduciary duties to the Receivership Entities.

3.      Upon information and belief, Beracha also solicited money from other investors to pour into Illarramendi's various "investment" vehicles in return for fees and kickbacks, thereby profiting from and helping Illarramendi victimize innocent investors.   It is these investors who suffered the consequences of Illarramendi's acts and Beracha's flow of capital to help sustain Illarramendi.

4.      Upon information and belief, Beracha and Illarramendi completely ignored corporate formalities as money loaned to Illarramendi's entities by Beracha-affiliated entities was frequently paid back by different Illarramendi investment vehicles to different Beracha-affiliated entities in their illegal shell game.

5.       Finally, upon information and belief, Beracha assisted Illarramendi with the payment of millions of dollars in bribes to at least one Venezuelan government official. The totality of Beracha's involvement clearly shows that he was someone who knew about the massive fraud in which Illarramendi was engaged.

6.      This lawsuit is one of several steps the Receiver is taking in his continuing effort to recapture and return the investor proceeds stolen from funds managed and operated as a Ponzi scheme by Illarramendi and others affiliated with the MK Group and Highview Point Partners, LLC ("HVP Partners").

7.     The Receiver's investigation is ongoing.  To date, in total, the Receiver has identified approximately $171,675,738 in fraudulent transfers to the Defendants, comprising investor proceeds and other monies that must be recovered for distribution to Illarramendi's victims and creditors.  See Exhibit 1.

## RECEIVERSHIP ENTITIES

8.     **Special Opportunity Fund** ("SOF") is a fund registered in the Cayman Islands. SOF was formed on September 12, 2007, with the purported purpose of operating as a fund-of-funds while "making direct investments on an opportunistic basis."[2]

9.     **Michael Kenwood Venezuela** ("MKV") is a fund registered in the Cayman Islands.  MKV was formed on August 14, 2008, with the purported purpose of investing in "the Bolivarian Republic of Venezuela ("Venezuela") credit spectrum including arbitrage between the Venezuelan Bolivar (VEF) and the US dollar (USD), as well as high returns currently being offered by Venezuela USD international bonds."

10.     **Short Term Liquidity Fund** ("STLF") is a fund registered in the Cayman Islands.  STLF was formed on June 20, 2008, with the purported purpose of investing in "products offered in the global fixed income and derivatives markets to generate gains through short-term (under one year) investments in sovereign securities, particularly those subject to currency arbitrage opportunities in their country of issuance, due to a particular country's exchange rate policy."

---

[2]Unless otherwise explicitly defined herein, the Receiver adopts for purposes of this complaint the defined terms as set forth in the Amended Order Appointing Receiver dated January 4, 2012.

11.     **Michael Kenwood Consulting, LLC** ("MK Consulting") is a New York limited liability company organized on May 2, 2006, and served as the primary entity through which funds flowed for payments to employees of the MK Group.

12.     **Michael Kenwood Group, LLC** is a Connecticut limited liability company formed on January 26, 2007, and served as the holding company for MK Consulting, MK Capital Management, LLC, MKAM, and other MK Entities.

13.     **Michael Kenwood Capital Management, LLC** ("MK Capital"), is a Delaware limited liability company organized on December 19, 2006, and served as an unregistered investment advisor for the funds MKV, SOF and STLF (collectively the "MK Funds"). The investors in the MK Funds were primarily offshore individuals and entities, including the Pension Funds, defined below.

14.     **Michael Kenwood Asset Management, LLC** is a Delaware limited liability company organized on December 19, 2006. Among other things, MKAM was the owner of certain private equity investments Illarramendi funded with misappropriated investor money.

15.     **Highview Point Partners, LLC** is a Delaware limited liability company organized on August 27, 2004. HVP Partners was founded by Illarramendi and two other individuals and managed the Highview Point Master Fund Ltd. (the "Master Fund") and two feeder funds (Highview Point Offshore, Ltd. ("HVP Offshore") and Highview Point LP ("HVP LP")).

## CRIMINAL PROCEEDING

16.     On or about March 7, 2011, the United States Attorney's Office for the District of Connecticut filed a Criminal Information (the "Information") against Illarramendi alleging that Illarramendi, with others, had engaged in a massive Ponzi scheme involving hundreds of millions of dollars of money supplied primarily by foreign institutional and individual investors.

4

17.     According to the Information, Illarramendi engaged in or caused multiple acts in furtherance of the Ponzi scheme, including but not limited to: (1) making false statements to investors, creditors and employees of the Receivership Entities, the SEC, and others to conceal and continue the scheme; (2) creating or causing fraudulent documents to be created; (3) engaging in multiple transactions without documentation in an effort to conceal and continue the scheme; (4) transferring millions of dollars of assets across the Receivership Entities and other entities he controlled to make investments in private equity companies; and (5) commingling assets across the Receivership Entities and other affiliated entities.  On March 7, 2011, Illarramendi pleaded guilty to a much larger fraud than was originally pleaded in the Commission's complaint.  He pleaded guilty to felony violations of wire fraud (18 U.S.C. § 1343), securities fraud (15 U.S.C. §§ 78j(b) and 78ff), investment adviser fraud (15 U.S.C. §§ 80b-6 and 80b-17) and conspiracy to obstruct justice (18 U.S.C. § 371).

18.     As Illarramendi publicly acknowledged during his plea allocution he began engaging in this scheme years earlier to conceal from investors and creditors losses of several hundred million dollars.

## THE DEFENDANTS

### Moris Beracha

19.     Beracha is a Venezuelan national and a finance and management executive with over 20 years of experience in various finance and other industries.  Among other things, he is currently Chairman of the Board of Directors at Celistics Group in Caracas, Venezuela, a distributor of mobile phone equipment that operates primarily in Latin America, and serves on the Board of Directors at Fractal Fund Management.

20.     Upon information and belief, Beracha is one of the wealthiest people in Venezuela with significant and uncommon access to Venezuelan government officials.

21.     Upon information and belief, Beracha owns multiple homes in Venezuela.  He also owns homes or is affiliated with entities that own homes on his behalf in Florida and New York.

22.     Upon information and belief, Beracha regularly conducts business in the United States and elsewhere.   Upon information and belief, Beracha has met with Illarramendi numerous times including in Stamford, Connecticut, New York, New York, and Miami, Florida. Upon information and belief, these meetings were related to the transactions discussed in greater detail below.

**Entities Affiliated with Beracha**

23.     Upon information and belief, Beracha plays a significant role in all of the entities named as defendants in this action.  Upon information and belief, these are or were alter egos of Beracha and he executed complete dominion and control over them at all relevant times.  Not only do many of these entities share addresses, officers, directors, or points of contact, but, as discussed in greater detail below, these entities under his direction and control, frequently received fraudulent transfers from Receivership Entities for no value, services, outlay of money or any other significant reason.  Beracha's facilitation of investments in Receivership Entities frequently led to compensation, kickbacks or interest in excess of 40% paid to various Beracha-affiliated entities.  Beracha's apparent ability to direct payments from Illarramendi to specific Beracha-affiliated entities, regardless of whether those entities were involved in the underlying transactions, is indicative of Beracha's overall control of these defendants and his comingling of assets among the various entities.

24.     Upon information and belief, 4A Star Corp. ("4A Star") is a Panamanian entity with an address of Calle Aquilino de la Guardia No. 8, City of Panama, Republic of Panama. Upon information and belief, 4A Star is the offshore subsidiary of Bestinvest Casa de Bolsa, a

Venezuelan brokerage firm where Beracha serves as a director.  Upon information and belief, 4A Star shares officers and directors with defendants Hermitage Consultants Inc., La Signoria Assets Corp. and Netvalue Strategy, SA.  In a claim filed against MKAM, Beracha is listed as 4A Star's "principal."   4A Star filed a claim with the Receiver and therefore has consented to the jurisdiction of this Court.

25.     Upon information and belief, Bradleyville Ltd. ("Bradleyville") is a British Virgin Islands entity with a registered address c/o Luis Otero, Commonwealth Trust Ltd, Drake Chambers, British Virgin Islands.  Upon information and belief, Bradleyville is a subsidiary or affiliate of Bestinvest Casa de Bolsa ("Bestinvest"), and is owned or otherwise controlled or operated by Beracha.  Upon information and belief, Bradleyville owns property at 845 United Nations Plaza, Unit 36A, New York, New York 10017.  Upon information and belief, Beracha formerly owned this residence and transferred ownership to Bradleyville in 2007.

26.     Although not named as a defendant herein, upon information and belief, Bestinvest is a Venezuelan entity with a registered address Av. Francisco de Miranda, Torre KPMG, Piso-1, Chacao, Venezuela.  Upon information and belief, Beracha and Luis Otero ("Otero") are directors of Bestinvest.  Upon information and belief, defendants Rowberrow Trading, Bradleyville Ltd., and La Signoria Assets Corp. are subsidiaries of Bestinvest.

27.     Upon information and belief, Brave Spirit Ltd. ("Brave Spirit") is a British Virgin Islands entity with a registered address of Commonwealth Trust Limited, PO Box 3321, Drake Chamber, Road Town, Tortola, British Virgin Islands.

28.     Upon information and belief, Dobson Management Corp. ("Dobson") is a Panamanian corporation with a registered address of Calle 53E, Urbanizacion Marbella, MMC Tower, Piso 16, Panama.

29.     Upon information and belief, East Coast Consultant Corp. ("East Coast") is a foreign entity with an address of Torre KPMG, Ave Francisco de Miranda, Chacao, Piso 1, Panama.

30.     Upon information and belief, Fractal Fund Management Ltd. ("Fractal Fund") is a British Virgin Islands entity with a registered address of Akara Building, 24 de Castro Street, Wickhams Cay, Road Town, Tortola, British Virgin Islands.   Upon information and belief, Beracha introduced Fractal Fund to the MK Group, HVP Partners and their affiliates and serves on the board of directors at Fractal Fund.   Fractal Fund filed a claim with the Receiver and therefore has consented to the jurisdiction of this Court.

31.     Upon information and belief, Fractal Fund is affiliated with Fractal Advisors LLC ("Fractal Advisors"), a Florida corporation with a principal place of business located at 3363 N.E. 163rd Street, Suite 509, North Miami Beach, Florida 33160.   Upon information and belief, Beracha is a managing director of Fractal Advisors.

32.     Upon information and belief, Fractal Factoring Fund ("Fractal Factoring") is a share class of Fractal Fund.

33.     Upon information and belief, Fractal Factoring II ("Fractal Factoring II") is a share class of Fractal Fund.[3]

34.     Upon information and belief, Fractal L Holding Ltd. ("Fractal L Holding") is a British Virgin Islands entity with a registered address of Akara Building, 24 De Castro Street,

---

[3] To the extent that Fractal Factoring and Fractal Factoring II are not separate and distinct legal entities, the allegations against Fractal Factoring and Fractal Factoring II are also alleged against Fractal Fund, Fractal L Holding and Fractal P Holding.

Wickhams Cay 1, Road Town, Tortola VG1110, British Virgin Islands.  Upon information and belief, Fractal L Holding was formed on January 11, 2006.

35.     Upon information and belief, Fractal P Holding Ltd. ("Fractal P Holding") is a British Virgin Islands entity with a registered address of Akara Building, 24 De Castro Street, Wickhams Cay 1, Road Town, Tortola VG1110, British Virgin Islands.  Upon information and belief, Fractal P Holding was formed on March 14, 2007.

36.     Upon information and belief, Hermitage Consultants Inc. ("Hermitage") is a Panamanian entity with a registered address of c/o Posadas & Vecino Consultores Internacionales Inc., Calle 53E, Urbanizacion Marbella, World Trade Centre, 14th Fl, Suite 1404, City of Panama, Republic of Panama.  Additionally, Hermitage and 4A Star share the same registered agent, Luis Miguel Hincapie Corco, and three of the same directors, Luis Maria Pineyrua Pittaluga, Crestwood Services Ltd., and PVCI Nominees Ltd.  Upon information and belief, Hermitage is another affiliate of Bestinvest.  Upon information and belief, Hermitage also shares officers and directors with defendants La Signoria Assets Corp. and Netvalue Strategy, S.A.

37.     Upon information and belief, La Signoria Assets Corp. ("La Signoria") is a Panamanian entity with a registered address of Calle Aquilino de la Guardia No. 8, City of Panama, Republic of Panama.  Upon information and belief, La Signoria shares officers and directors with defendants 4A Star, Hermitage, and Netvalue Strategy, S.A.  Upon information and belief, La Signoria is an affiliate or subsidiary of Bestinvest and the email address affiliated with contacting La Signoria is Beracha's.

38.     Upon information and belief, Netvalue Strategy, S.A. ("Netvalue") is a Panamanian entity with a registered address of Aquilino de la Guardia No. 8, Panama City,

Panama.  Upon information and belief, Netvalue shares officers and directors with defendants 4A Star, Hermitage, and La Signoria and is an affiliate of Bestinvest.  Upon information and belief, Netvalue also has the same address as 4A Star and La Signoria.

39.     Upon information and belief, Northwestern International, Ltd. ("Northwestern") is a British Virgin Islands entity with an address c/o Kuzniecky & Co., Commonwealth Trust Ltd., Road Town, Tortola, British Virgin Islands.  Upon information and belief, Beracha is its president and the email addresses associated with Northwestern are Beracha's.  Upon information and belief, Northwestern owns property located at 845 United Nations Plaza, Unit 80B, New York, New York 10017.  This is the same building where Bradleyville owns property.

40.     Upon information and belief, Rowberrow Trading Corp. ("Rowberrow") is a British Virgin Islands entity with an address of Nemours Chambers, Qwomar Complex 4/F, P.O. Box 3170, Road Town, Tortola, British Virgin Islands.  Upon information and belief, Beracha is a principal and the co-owner of Rowberrow and it is a subsidiary or affiliate of Bestinvest. Rowberrow filed a claim with the Receiver and therefore has consented to the jurisdiction of this Court.

41.     Upon information and belief, Sunny Services Corporation ("Sunny Services") is a British Virgin Islands entity with a registered address c/o Arias Fabrega & Fabrega Trust Co. BVI Limited, Wickhams Cay, Road Town, Tortola, British Virgin Islands.  Upon information and belief, Sunny Services was introduced to the MK Group by Beracha and Otero.  Upon information and belief, Sunny Services' investment with MKV was managed by Beracha and Otero.  Sunny Services filed a claim with the Receiver and therefore has consented to the jurisdiction of this Court.

## JURISDICTION AND VENUE

42.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1367 in that this is an action brought by the Receiver appointed by this Court concerning

property under this Court's exclusive jurisdiction.  *See Securities and Exchange Commission v.*

*Illarramendi*, *Michael Kenwood Capital Management, LLC et al. C.A.*, No. 3:11-cv-00078

(JBA), Amended Order Appointing Receiver (June 22, 2011)(Docket #279).

43.    This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C.

§ 754 and 28 U.S.C. § 1692.

44.    The District of Connecticut is the appropriate venue for any claims brought by the

Receiver pursuant to 28 U.S.C. § 754 as the acts and transfers alleged herein occurred in the

District.

## RECEIVER'S STANDING

45.    On January 14, 2011, the SEC commenced a civil enforcement action against

Illarramendi, MK Capital, and various Relief Defendants (the "SEC Defendants").  The SEC's

complaint alleges that Illarramendi and others misappropriated investor assets in violation of

Section 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-(8)

thereunder.  The SEC also sought equitable relief, including injunctions against future violations

of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

46.    Simultaneously with the filing of its complaint, the SEC sought emergency relief,

including a preliminary injunction, in the form of an order freezing the assets of the SEC

Defendants.  The SEC also sought the appointment of a receiver over those assets.

47.    On February 3, 2011, the Court appointed Plaintiff John J. Carney, Esq. as

Receiver over all assets "under the direct or indirect control" of MK Capital and Relief

Defendants MKAM, MKE&I, and MKEI Solar, LP.  A motion to expand the scope and duties of

11

the Receivership was filed on March 1, 2011, and the Amended Receiver Order was entered on March 1, 2011, expanding both the duties of the Receiver and the definition of the Receivership Estate to include the MK Funds, namely SOF, MKV and STLF.

48.     On June 22, 2011, the Court entered a second Amended Receiver Order, which, *inter alia*, expanded the scope of the Receivership Estate to include HVP Partners as a Receivership Entity.  By additional order of the Court, the Receivership was again expanded on July 5, 2011, to include MK Master Investments LP, MK Investments, Ltd. and MK Oil Ventures LLC ("MK Oil").  On January 4, 2012, the Court entered another modified Receiver Order to include additional reporting requirements.  On February 2, 2012, the Receiver filed a Motion to Expand the Receivership to include the HVP Funds; this Motion is currently pending before this Court.

49.     Pursuant to the Court's Amended Order Appointing Receiver of January 4, 2012 ("Amended Receiver Order"), the Receiver has the duty of, among other things, identifying and recovering property of the Receivership Entities to ensure the maximum distribution to the Receivership Entities' defrauded creditors and to maximize the pool of assets available for distribution.  To accomplish this goal, the Receiver must take control of all assets owned by or traceable to the Receivership Estate, including any funds that were stolen, misappropriated, or fraudulently transferred as alleged herein.

50.     The Receiver has standing to bring these claims pursuant to, among other things, Connecticut Uniform Fraudulent Transfer Act ("CUFTA"), Conn. Gen. Stat. § 55-552, and Connecticut common law.

51.     The Receiver has standing to bring claims that the Receivership Entities could have brought on their own behalf.  As alleged herein, Illarramendi freely commingled proceeds

between and among the Receivership Entities such that the Receivership Entities, including the MK Funds, are creditors of one another.  Accordingly, the Receiver has standing to recover the fraudulent transfers made to the Defendants.

## THE FRAUDULENT SCHEME

**I.    ILLARRAMENDI'S NETWORK OF ENTITIES AND FUNDS**

52.    The Ponzi scheme at the center of this action involves the misappropriation and misuse of investor assets by two investment advisers located in Stamford, Connecticut—namely, HVP Partners and MK Capital.

53.    To perpetrate and prolong his fraud, Illarramendi fabricated entire transactions and the profitability of actual transactions in an effort to conceal his scheme and defraud creditors.  To obfuscate his ever-growing shortfall, Illarramendi played a shell game with the remaining investor funds, constantly shuffling funds from one entity or fund to the next, creating a pervasive commingling of funds and giving off the false appearance of profitability.

54.    From at least 2005 through the Fall of 2010, Illarramendi caused HVP Partners, the MK Group, the MK Funds, and the HVP Funds to engage in scores of extraordinarily complex and multi-layered transactions as part of a Ponzi scheme, all in an effort to conceal investment losses and the misappropriation of investor assets.  Illarramendi conducted the fraud using the HVP Funds and the MK Funds in tandem, engaging in many related and fabricated transactions between the two groups, which included purported loans, and extensive undocumented transfers of cash between them for the purpose of concealing massive losses in order to hinder, delay or defraud the investors and creditors of the Receivership Entities and HVP Funds.

55.    For example, as of the end of 2010, the purported value of one of the MK Funds, STLF, was as high as $540 million.  In fact, however, STLF was insolvent, with assets

substantially less than that primarily because many of its assets were used during 2010 to pay investor redemptions to investors in MKV as well as obligations to other third parties.

56.    Any separation between the MK Funds and the HVP Funds was a legal fiction as Illarramendi freely and indiscriminately commingled, misappropriated and looted investor proceeds to further the fraud and conceal it from investors and creditors.

## II.    THE GENESIS OF THE FRAUD

57.    As noted above, in August 2004, Illarramendi and two other individuals formed HVP Partners, each holding a one-third ownership share.  According to the Limited Liability Corporation Agreement, the stated purpose of HVP Partners was to act as the investment manager of HVP Offshore, a hedge fund to be nominally based in the Cayman Islands (in fact, the fund was completely dominated and controlled by HVP Partners) and for engaging in any other lawful act or activity for which a limited liability company may be formed under the Delaware Limited Liability Company Act.

58.    In October 2005, Illarramendi, as a principal of HVP Partners, brokered a deal on behalf of HVP Offshore and others to purchase and then immediately sell at a profit a Credit Lyonnaise bond (the "Calyon Bond").  The Calyon Bond deal went awry from the beginning and rather than make almost a million dollars in profit as Illaramendi had expected, the deal generated a cash shortfall of approximately $5.2 million which was absorbed by HVP Offshore.

59.    To cover up the $5.2 million shortfall (the actual loss and the lost profit from the deal), Illarramendi simply instructed GlobeOp, HVP Offshore's fund administrator, to record the fictitious profits from the Calyon Bond as an investment in Ontime Overseas, Inc. ("Ontime"), an entity controlled by Illarramedi's brother-in-law, thus causing HVP Offshore's books and records to be fraudulently misstated.

60.     This sleight of hand, however, did not buy Illarramendi enough time to replace the missing funds.  In order to insure that the fraudulent transaction was removed from the fund's books before a year-end audit could discover the fraud, on December 15, 2005, Illarramendi purported to redeem HVP Offshore's fraudulent investment in Ontime.  To fund this phantom redemption Illarramendi transferred $5.5 million to Ontime from the bank account of HVP Partners in several transactions over the course of November and December.  None of these transfers reduced the size of the hole, however.  It still stood at approximately $5 million, or roughly ten percent of the $52 million of the net asset value of the HVP Funds.  Thus began a series of convoluted transactions designed to hide the ever expanding "hole" created by the Calyon Bond deal that would span the following five years.

61.     From the very beginning of the fraud, Beracha provided Illarramendi with critical financing to sustain the Ponzi scheme, and, in return, Beracha and his entities profited handsomely.  Upon information and belief, Beracha, through Northwestern, received $170,000 for assisting in brokering the Calyon Bond transaction, even though the transaction was actually a loss for HVP Offshore.

62.     As the hole grew over the next five years and Illarramendi became more and more desperate for cash, Illarramendi repeatedly turned to Beracha for help, and Beracha reaped a windfall.

## III.   "OFF-THE-BOOKS" BANK ACCOUNTS

63.     In order to fraudulently conceal the hole, perpetuate the Ponzi scheme, and engage in transactions that were not recorded in the books and records of HVP Partners and MK Capital, Illarramendi used various bank accounts, including accounts in the names of shell companies such as Naproad Finance S.A. and HPA, Inc.  At all relevant times, those bank accounts were under the

15

control of Illarramendi and HVP Partners and contained commingled funds from Receivership Entities and the HVP Funds.

64.    HPA, Inc. ("HPA") was incorporated in Panama in July 2005 and was dissolved in May 2008.  In August 2005, HVP Partners was provided with full power of attorney over HPA.  In 2007, HPA filed documents to effect a corporate name change from HPA to HIGHVIEWPOINT CST, INC.  Bank statements for accounts opened in the name of HPA (the "HPA Account") were addressed to HVP Partners' office in Stamford, Connecticut.  In order to effectuate transactions using the HPA Account, Illarramendi repeatedly sent wire instructions, on HVP Partners letterhead, to the bank.  In these wire authorization letters, Illarramendi referred to the HPA Account as "our" (i.e. HVP Partners) bank account.  Thus, the HPA Account was, in reality, an HVP Partners bank account opened under a false name.

65.    Naproad Finance S.A. ("Naproad") was incorporated in Panama in July 2005 and was dissolved in May 2008.  In September 2005, HVP Partners was provided with full power of attorney over Naproad.  In 2007, Naproad filed documents to effect a corporate name change from Naproad to HPP INTERNATIONAL S.A.  Bank statements for accounts opened in the name of Naproad (the "Naproad Account") were addressed to HVP Partners' office in Stamford, Connecticut.  In order to effectuate transactions using the Naproad Account, Illarramendi repeatedly sent wire instructions, on HVP Partners letterhead, to the bank.  In these wire authorization letters, Illarramendi referred to the Naproad Account as "our" (i.e. HVP Partners) bank account.  Thus, the Naproad Account was, in reality, an HVP Partners bank account opened under a false name.  As set forth below, Beracha received numerous fraudulent transfers from the HPA and Naproad Accounts.

## IV.     THE "PERMUTA" MARKET

66.     Illarramendi, in an effort to conceal the fraud,  engaged in various transactions with Beracha in the unofficial Venezuelan currency market.  Upon information and belief, the "permuta market" or "swap market" was a parallel currency market in operation in Venezuela in which government bonds could be bought in bolivars and then sold for dollars.  Upon information and belief, it was possible to purchase a bolivar-denominated bond through brokerage houses, swap it for a dollar-denominated bond (clearable through Euroclear), and then sell it to receive U.S. dollars offshore.  As a result, the relation between the prices of these two bonds became a proxy for the quasi-free market currency exchange rate.

67.     Upon information and belief, this market was abolished by the Venezuelan government in or about May 2010.  In its place, Venezuelan authorities created the Sistema de Transaccion con Titulos en Moneda Extranjera (SITME), essentially a bond-trading system run by the Central Bank, which sells dollars at a fixed rate.

68.     Upon information and belief, Illarramendi relied on access to the permuta market to assist in his operation of the Ponzi scheme.

69.     Illarramendi's business relationship with Beracha coupled with Beracha's access to and connections with Venezuelan government and banking officials was instrumental to Illarramendi's ability to perpetuate the Ponzi scheme.

### THE TRANSACTIONS CONCERNING BERACHA
### AND HIS AFFILIATED ENTITIES

### I.     Beracha and his Entities Benefit Twice from Sale of EDC Notes

70.     Transactions entered into by Illarramendi frequently benefited Beracha and his entities with little or no risk on their part.  For example, on or about November 29, 2006, Export Development Canada ("EDC") sold medium term notes to HPA for approximately $56,036,640.

The nominal value of these notes was approximately $63,678,000.  On or about November 24, 2006, Beracha emailed Illarramendi to say he had "everything squared away."  Beracha confirmed the terms of the transaction, the amounts involved, the trade date and the settlement date.

71.     On or about the same day as EDC's sale of the notes, HPA transferred the EDC notes to three pension funds for employees of Petroleos de Venezuela SA ("PDVSA," the nationally owned oil company of Venezuela): one transfer to Fondo de Prevision de los Trabajodores de Petroleos de Venezuela S.A. y sus Filiales ("PDVSA Workers") consisted of notes with a nominal value of approximately $5,179,000 in return for same amount in cash; the second transfer to Asociacion Civil Administradora de los Fondos de Pensiones de los Jubilados de Petroleos de Venezuela, S.A. y sus Filiales ("APJ PDV") consisted of notes with a nominal value of approximately $37,656,000 in return for the same amount in cash; and the third transfer to APJ International, Ltd. ("APJ International", and with PDVSA Workers and APJ PDV, collectively, the "Pension Funds") consisted of notes with a nominal value of approximately $20,843,000 in return for the same amount in cash.

72.     This transaction was a windfall for Beracha and his affiliated entities as they received both 8% interest on the nominal value of the EDC notes and an additional 1% fee based on the nominal value of the notes.

73.     To make these payments, on or about December 8, 2006, Illarramendi transferred from the HPA Account approximately $666,692 to Northwestern, approximately $900,000 to Bradleyville, and approximately $1,160,000 to East Coast.  On or about December 12, 2006, Illarramendi transferred another approximately $636,780 to Northwestern from the Naproad Account.

74.     At some point on or about December 15, 2006, the $666,692 transfer to Northwestern was cancelled and that amount was redirected to Beracha personally as, based on wire instructions issued by Illarramendi on HVP Partners letterhead dated December 15, 2006, "the final beneficiary…[was] not Northwestern International Ltd., but is instead in the name of the company's President, Mr. Moris Beracha."  Again, although Illarramendi instructed that this transfer was to be in the name of HPA, the instructions for these transfers were issued by HVP Partners, were on HVP Partners letterhead, and Illarramendi wrote that the funds were to be "from our account," which was, upon information and belief, an HVP Partners account.

75.     In connection with this EDC transaction, Beracha and his entities received fraudulent transfers in the form of interest payments and fees of approximately $3,363,472 with no benefit provided to HVP Partners.

76.     Beracha and his entities not only profited on the purchase of the EDC notes, but they profited a second time when the notes were sold back to EDC.

77.     On or about March 7, 2007, the Pension Funds transferred the same notes back to HPA.  After this, Illarramendi, through HVP Partners, paid Beracha and his entities out of the Naproad Account despite Illarramendi's apparent frustration with the lack of profits he would realize from the transaction as related in a lengthy email exchange between Illarramendi and Beracha on or about March 8, 2007:[4]

> Please understand my frustration within the context of the whole process of this transaction and in the relationship with the friends, in which I am really a zero to the left [worthless], who is crossed

---

[4] This email and other emails quoted herein were originally in Spanish and the quoted text contained in this complaint is taken from certified translations of those Spanish emails.

out, and is doing everything through conversations with intermediaries and then anything that they don't like it's my fault. I can't work like this again. Problems have to be discussed openly and the market risks have to be shared. I can't continue to take market risks by myself, because the last time it cost me 5 million in losses, which I had to pay from my own pocket, and for which I even had to mortgage my shirts, and now is when I am starting to climb out of that hole.

Beracha responded the next day, in part:

I want to tell you that with me there will never be a problem because of money. I consider you my friend and that is more important than all the money. I agree with everything that you suggest and I do think that we are going to continue to do things together but we have to value ourselves more and start to say no if things aren't more fair. Warm regards and we are a team.

78.    Ultimately, upon information and belief, these payments were made for two purposes. The first payment was made to reward Beracha as on or about March 22, 2007, he received approximately $1,173,213.

79.    Upon information and belief, the second group of payments was made so bribes could be paid to a PDVSA official in order to arrange for the transaction. On or about the same day, approximately $1,445,183 was paid to Dobson, approximately $2,632,534 was paid to Northwestern, and approximately $7,658,383 was paid to East Coast. Upon information and belief, these payments to Dobson, Northwestern and East Coast, totaling approximately $11,736,100, were then paid as a bribe to a PDVSA official, referred to by Beracha and Illarramendi as "black."

80.    For no investment on their part, Beracha and his affiliated entities received fraudulent transfers of approximately $12,909,313 when the bonds were sold back to EDC. None of these entities were involved in the underlying EDC transaction yet they profited significantly. When added to the approximately $3,363,472 already received, Beracha and his

entities received fraudulent transfers totaling approximately $16,272,785 from the two EDC transactions and were unjustly enriched by that amount.

## II.      Beracha and Northwestern Benefit from Money Advanced by Fractal

81.     On or about August 27, 2007, Fractal Fund entered into an Enhanced Cash Management Agreement ("ECMA") with HVP Partners.  Under the terms of the agreement, Fractal Fund was to provide money to HVP Partners in exchange for a guaranteed rate of return of at least 8%.

82.     Upon information and belief, Illarramendi and Beracha also entered into a separate side agreement whereby Beracha would receive 5% of the amount invested by Fractal Fund under the ECMA.  Upon information and belief, this 5% fee to Beracha and his entities was known to Fractal Fund's management as in an August 20, 2007 email from Beracha, he notified both Illarramendi and Alain Bibliowitz, the managing director of Fractal Advisors, of the "5% Fee payable upon receipt of the funds and when the agreement is signed."

83.     Pursuant to the terms of the ECMA, on August 27, 2007, Fractal Fund made an initial $30,000,000 transfer to an HVP Partners account at Wachovia held in the name of Naproad.

84.     On August 28, 2007, Beracha emailed Illarramendi with the instructions for making the side payment.  Thereafter, on or about August 29, 2007 and September 6, 2007, HVP Partners transferred approximately $712,500 and $787,500 respectively to Beracha from the Naproad Account.  Upon information and belief, this $1,500,000 represented the 5% fee to which Beracha was entitled pursuant to his side agreement with Illarramendi.

85.     Upon information and belief, Illarramendi agreed to pay a supplemental fee to Beracha in the amount of approximately $450,000, which was paid from the Naproad Account to

Beracha on or about August 31, 2007.  Instructions for this payment were contained in the same email as the instructions for the payment of the $1,500,000.

86.     On or about November 16, 2007, Fractal Fund transferred an additional $20,000,000 to the HVP Partners account held in the name of Naproad pursuant to the ECMA.

87.     Upon information and belief, Illarramendi and Beracha entered into a second side agreement to further compensate Beracha for Fractal Fund's investment.

88.     On or about November 27, 2007, Illarramendi paid Beracha approximately $2,000,000 in "consulting fees" and Northwestern approximately $550,000 in "consulting fees" from the HPA Account pursuant to the terms of the second side agreement.

89.     All the while, HVP Partners generated customer statements for the Fractal Fund ECMA reflecting fictitious amounts of interest and capital gains reportedly earned on Fractal's $50,000,000 "investment."

90.     The statements indicated that the $50,000,000 was invested in a money market fund yet no legitimate money market fund could have generated the purported returns realized in the elapsed time.  Upon information and belief, the money market fund identified in the statements does not exist.

91.     Over the course of the "investment," Fractal Fund withdrew approximately $59,528,949 reflecting the principal and fictitious interest/capital gains earned on the deposited funds.  First, to partially redeem the investment and pay the interest generated, on or about March 4, 2008, HVP Partners paid Fractal Fund from the Naproad Account approximately $6,959,141.  This was followed by payments to Fractal Fund by HVP Partners of approximately $42,569,808 on or about May 1, 2008 and approximately $10,000,000 on or about May 7, 2008.

92.     This approximately $9,528,949 in fictitious profits, with no basis in an actual investment, represents fraudulent transfers received by Fractal Fund to the detriment of the Receivership Entities.  These fictitious profits, coupled with the side payments Beracha received, are not the product of a legitimate investment and should have caused Beracha or Fractal Fund to question the validity of the transactions in which Illarramendi engaged.

93.     In sum, Beracha and his entities received fraudulent transfers of approximately $14,028,949 and were unjustly enriched by that amount.

## III.     Beracha, BM Financial and the 2007 PDVSA Trade, Part I

94.     Upon information and belief, Beracha facilitated a bond swap transaction whereby BM Financial (upon information and belief, a Beracha-affiliated entity) received $38,000,000 raised from the Master Fund and other sources, then engaged in a permuta transaction, and provided approximately $89,500,000 in bolivar denominated Venezuelan government bonds to PDVSA.  PDVSA, in turn, transferred approximately $47,599,685 in dollar denominated PDVSA bonds to HPA.  Upon information and belief, as part of this transaction, BM Financial retained approximately $1,548,416 of the $38,000,000, which the Receiver is not seeking at this time.

95.     Upon information and belief, aside from BM Financial's retention of money, Illarramendi compensated Beracha for facilitating this bond transaction with PDVSA.  To do so, on or about October 27, 2007, HPA transferred approximately $1,686,283 to Beracha from the HPA Account.  Following that transfer, on or about November 6, 2007, HVP Partners transferred another approximately $7,296,716 to Hermitage from the HPA Account.  The structure of this transaction and wire transfer instructions were discussed over emails between Beracha and Illarramendi dated October 23, 2007.   Among other things, Beracha told Illarramendi in

substance and in part that the approximately $7,200,000 was the amount owed to a PDVSA official as a bribe payment.

96.     In sum, Beracha and his entities received fraudulent transfers of approximately $8,982,999.

97.     Beracha and Hermitage provided no value in exchange for these transfers. Beracha and Hermitage provided neither services, nor anything of substance to HVP Partners in return for these fraudulent transfers.   Beracha and Hermitage should have recognized that receiving payment for no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund.  Ironically, as part of one email exchange dated November 2, 2007 where Beracha was discussing the split of the profits related to this transaction, Beracha wrote Illarramendi and said, "Buddy, I'm your best producer hahahahaha."

## IV.     Beracha, BM Financial and the 2007 PDVSA Trade, Part II

98.     Upon information and belief, on or about October 18 and 19, 2007, Beracha facilitated another bond swap transaction whereby BM Financial received approximately $46,000,000 from HPA and the Master Fund.   The transfer from HPA was directed by Illarramendi on HVP Partners letterhead and again referred to "our account" completely blurring any line of distinction between HPA and HVP Partners.

99.     Upon information and belief, BM Financial then used approximately $45,500,000 (keeping the remaining $500,000 for itself, which the Receiver is not seeking at this time) to engage in permuta transactions to obtain bolivar denominated Venezuelan government bonds in the amount of $113,537,156, which it provided to PDVSA.  PDVSA, in turn, transferred approximately $60,900,000 in dollar denominated PDVSA bonds to HPA.

100.     In connection with this transaction, Illarramendi caused certain amounts to be fraudulently transferred to Beracha and certain of his entities despite the fact that neither Beracha

nor these entities were involved in funding the initial investment or played any role in carrying out the transaction.

101.    On or about November 7, 2007, HVP Partners paid Bradleyville approximately $2,094,530 and the following day paid Beracha approximately $1,508,266 out of the HPA Account.  On or about December 5, 2007, HVP Partners paid Beracha approximately $1,500,000 out of the Naproad Account and on or about December 6, 2007 SOF paid Hermitage approximately $6,764,126.  The funds SOF provided to Hermitage were provided pursuant to a note from HVP Partners, and, upon information and belief, were used to pay a bribe to a PDVSA official.

102.    A December 4, 2007 email exchange between Beracha and Illarramendi discussed payment instructions related to this transaction:

>    Illarramendi writes: OK buddy.  I was traveling and these [expletive] have turned into [expletive] a little over compliance and the number of wire transfers.  I think I have it all arranged. They have to go out slowly.  Hermitage, Rowberrow and La Signoria will go out tomorrow.  On Thursday Moris will go out and Northwestern on Friday.
>
>    Beracha responds: That's fine sending them out like that.  Buddy, you've got me screwed, too much responsibility for me.  Really, send them as you said but shoot.  It's a lot of money daddy.
>
>    Illarramendi responded, in part: … We already know that executing this takes time and we don't like to send multiple wire transfers on the same day.  We can't go crazy because the avenues will close, pal.  Compliance is a reality of life, you assure me that none of these things is tied to something or someone who shouldn't be and there should be no problem, but we have to go slowly.
>
>    Beracha replied: Yes I agree completely.  Send them out like you said and I assure you that the accounts are all super clean.

103.    There was an additional payment of $2,500,000 to Davos International Bank that Beracha described as a "toll" for completing the permuta transaction.  Upon information and belief, this "toll" was a bribe for a PDVSA official.

104.    In sum, Beracha and his entities received fraudulent transfers of approximately $11,866,922 and were unjustly enriched by that amount.

105.    Neither Beracha, Hermitage, nor Bradleyville were involved in the initial bond transactions and therefore these fraudulent transfers unjustly enriched Beracha and the entities to the detriment of the Receivership Entities.  Beracha, Hermitage, and Bradleyville should have recognized that receiving payment for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund.

## V.    PDVSA Subscription in SOF

106.    On or about December 5, 2007, the Pension Funds made an approximately $34,000,000 subscription in SOF.

107.    Upon information and belief, this subscription was facilitated and made possible by Beracha's relationship with PDVSA.  For facilitating this transaction, upon information and belief, Illarramendi agreed to pay Beracha a 25% fee.

108.    To do so, Illarramendi transferred money from SOF and the Naproad Account to three of Beracha's entities on or about December 5, 2007.  SOF paid Rowberrow approximately $797,500.   HVP Partners paid La Signoria approximately $6,500,000, and Northwestern approximately $1,202,500 out of the Naproad Account.  This approximately $8,500,000 in fees was fraudulently transferred to Beracha and his entities.

109.    Rowberrow, La Signoria, and Northwestern should have recognized that receiving payment for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund.  Moreover, the payment from the Naproad Account is even

more suspect as it was not involved in the original subscription in SOF.  Again, Illarramendi blurred the lines between his various entities to the point that there were none.  These funds were fraudulently transferred to Rowberrow, La Signoria, and Northwestern as alter egos for Beracha.

## VI.     SOF Payments to Beracha Entities

110.    On or about May 6, May 8, and May 13, 2008, HVP Partners issued promissory notes to SOF in the amounts of $4,642,099, $2,586,000 and $4,709,664, respectively, each with a 0% interest rate.  SOF, in turn, made cash payments to Beracha and his affiliated entities.

111.    On or about May 7, 2008, SOF transferred approximately $981,591 to Net Value. On or about May 8, 2008, SOF transferred approximately $3,660,508 to Brave Spirit and approximately $786,000 to BM Financial.  (The Receiver is not seeking recovery of the amount paid to BM Financial at this time.)  Finally, on or about May 13, 2008, SOF transferred approximately $4,709,664 directly to Beracha.  This approximately $9,351,763 was paid for no consideration.

112.    Upon information and belief, Beracha and his affiliated entities' receipt of these payments was in exchange for absolutely nothing.  Beracha and his affiliated entities provided no value, services, or anything of substance to SOF in return for these fraudulent transfers.  Beracha should have recognized that receiving payment for essentially no work, services, or value, was not indicative of Illarramendi's operation of a legitimate hedge fund.

## VII.    Netvalue Strategy's Consulting Fee

113.    On or about July 1, 2008, MK Consulting paid approximately $326,742 to Netvalue ostensibly for consulting services.

114.    Upon information and belief, Illarramendi told the bank issuing the payment that the payment was for "consulting fees" yet, upon information and belief, Netvalue never provided

any consulting services to MK Consulting nor did it provide any value to MK Consulting.  This fraudulent transfer to Netvalue was to the detriment of the Receivership Entities.

**VIII.   Fractal's $10,000,000 Investment in the Master Fund**

115.    On or about October 1, 2008, HVP Partners issued a promissory note to Fractal P Fund, which, upon information and belief, is a fund held by the holding company Fractal P Holding, in the amount of $10,000,000 for a term of 21 days with an interest rate of 4%, which represents an annualized rate of approximately 69%.   Upon information and belief, Fractal P Fund, in turn, invested $10,000,000 in the Master Fund.

116.    Later in October, Fractal P Fund was repaid the $10,000,000 by seven different entities with various connections to Illarramendi.   But, upon information and belief, Fractal P Fund was not paid the agreed upon 4% interest, but instead was paid .4% interest.  On or about December 22, 2008 Illarramendi directed Ontime Financial Services, Inc. ("Ontime Financial"), an entity controlled by his brother-in-law, to pay Fractal Fund approximately $43,750.

117.    Upon information and belief, Ontime Financial previously paid the balance of the interest in the amount of approximately $356,875 to La Signoria, another Beracha entity, on or about October 20, 2008.   In sum, Beracha-affiliated entities received $400,625 in fraudulent transfers.

118.    Upon information and belief, the payment of the balance of the interest to La Signoria was hidden from Fractal P Holding's auditors.  On or about January 16, 2009, Illarramendi drafted a letter containing false and misleading information about the interest payments that was addressed to Fractal P Holding's auditors.  Because Fractal P Holding received a promissory note from HVP Partners, yet was repaid by third parties at less than the interest due, Fractal P Holding should have been on notice of irregularities and fraud by Illarramendi.  Furthermore, Illarramendi's provision of a letter to Fractal P Holding's auditors

with information Fractal P Holding, Fractal Fund and/or Fractal Advisors knew to be false, demonstrates the Fractal entities' collective knowledge of questionable business transactions that were not indicative of a legitimate business operation.

119.    Upon information and belief, based on an email exchange on October 17, 2008, between Jonathan Kadoch ("Kadoch"), a Fractal Advisors executive, and Beracha, it is clear that Kadoch knew that Fractal P Fund, the lender on the note, was not receiving the 4% interest to which it was entitled under the terms of the note.  Upon information and belief, Kadoch knew Fractal P Fund was only obtaining .4% interest and the balance of the interest was being paid to a Beracha entity, La Signoria.

**IX.     Beracha Entities Invest $26,000,000 in the Master Fund**

120.    On or about November 5, 2008, Beracha received a $15,000,000 promissory note for a term of six months with an interest rate of 48% from HVP Partners which represents an annualized rate of 96%.   Beracha, in turn, provided Master Fund with approximately $15,000,000 in Venezuelan Republic Bonds with a nominal value of $21,550,000.

121.    That same day, HVP Partners gave another promissory note for a term of six months with an interest rate of 48% to Rowberrow which represents an annualized rate of 96%. Rowberrow, in turn, gave $11,000,000 in cash to Master Fund.

122.    To repay these notes, the Master Fund and SOF made payments to three different Beracha entities.  One of those payments was made by SOF to Bradleyville on or about February 27, 2009, in the amount of approximately $1,521,563.

123.    This payment to Bradleyville by SOF in return for funds provided to Master Fund by other Beracha entities should have raised a red flag as an entity not involved in the initial transactions received the repayments from a different Receivership Entity.  SOF received no benefit yet paid Bradleyville in connection with this investment in Master Fund.  This fraudulent

transfer by SOF to Bradleyville in the amount of $1,521,563 was to the detriment of the Receivership Entities.

124.    In sum, Beracha received promissory notes from HVP Partners at 48% with a six month term.  Beracha and Rowberrow then transferred bonds and cash to the Master Fund.  The notes then were repaid early.  A total of approximately $36,910,000 was repaid in March and April 2009 by the Master Fund.  Those payments were made to three different Beracha entities which had no connection to the original promissory notes.

125.    In addition, Bradleyville, another Beracha entity, received a payment from SOF for approximately $1,500,000 and other Beracha entities received payments from other entities affiliated with Illarramendi.

126.    This repayment structure demonstrates that Beracha was or should have been aware that Illarramendi was comingling funds among various entities and Beracha was also using various entities, including Fractal Fund, La Signoria, and Bradleyville interchangeably and as alter egos for each other.

## X.    $30,000,000 in Promissory Notes Through Rowberrow

127.    On or about November 17, 2008, HVP Partners gave Rowberrow a promissory note in the amount of $30,000,000 for a term of six months with an interest rate of 48% which represents an annualized rate of 96%.  Rowberrow then paid out $30,000,000 to SOF, HVP Partners, and three other entities.

128.    Upon information and belief, pursuant to a side agreement between Illarramendi and Beracha, Rowberrow was to receive an extra 4% kickback on the $30,000,000.  SOF, not HVP Partners, paid this 4% kickback in two transfers on or about November 24, 2008.  One $600,000 transfer was paid to Rowberrow and the other $600,000 transfer was paid to La Signoria through a different entity, Ontime.

129.    Upon information and belief, at Beracha's request the original $30,000,000 promissory note was changed such that repayment was due to Unidad Corporativa de Mercados e Inversiones but the note was actually repaid to yet a different entity, Cartera de Inversiones Venezolanas CA ("Cartera").

130.    Upon information and belief, the note called for repayment of approximately $44,400,000 in principal and interest.  In May and June 2009, MKV paid off the note with three transfers to Cartera in the amounts of $13,800,000, $20,000,000 and $10,000,000 for a total of $43,800,000.

131.    On or about May 26, 2009, MKV transferred approximately $1,589,021 to Rowberrow.  Upon information and belief, $600,000 of this payment was for remaining amounts due on the promissory note and the remaining portion of this payment, $989,021, was paid to Rowberrow in connection with a previous unidentified trade.

132.    Beracha entities, Rowberrow and La Signoria, received fraudulent transfers totaling approximately $16,589,021.  Of this, Rowberrow and La Signoria directly received $2,789,021 in fraudulent transfers and Rowberrow received the benefit of the interest on the note based on its assignment of the note to Cartera.

## XI.    SOF/Fractal Loan and Investment Transactions

133.    Upon information and belief, on or about December 23, 2008, SOF gave Fractal Fund $15,000,000 as an investment in its Strategic US Treasury Solutions Fund-A ("STS-A") common shares.  Upon information and belief, Fractal L Holding then loaned $10,500,000 to SOF and SOF, in turn, invested $10,500,000 in the Fractal Factoring.  (On or about April 26, 2010, both the $10,500,000 loan and the investment in Fractal Factoring were increased in value to $12,000,000.)

134.    Upon information and belief, SOF never redeemed its subscriptions in either the STS-A Fund or the Fractal Factoring.  Because there was no redemption, Fractal Fund essentially received a $15,000,000 fraudulent transfer from SOF and Fractal Factoring received another fraudulent transfer from SOF based on the $12,000,000 investment for a total of $27,000,000. SOF was loaned only $12,000,000 by Fractal Fund to enable these investments in STS-A and Fractal Factoring. Therefore, upon information and belief, Fractal Fund and Fractal Factoring received fraudulent transfers of $14,685,065, accounting for a dividend payment made by Fractal Fund to SOF on or about July 17, 2009 in the amount of $314,935.

## XII.    4% Kickback for a $40,000,000 Investment

135.    Upon information and belief, in or about late 2008, Beracha raised approximately $40,000,000 for Illarramendi's use in connection with the Receivership Entities.

136.    Upon information and belief, pursuant to an agreement between Illarramendi and Beracha, Beracha was entitled to receive 4% of the $40,000,000.  Upon information and belief, to enable the payment of this 4%, on or about January 5, 2009, Illarramendi had HVP Partners issue a promissory note to SOF in the amount of $1,600,000.  SOF then made payments to Beracha's entities in the amount of $1,600,000.

137.    These payments consisted of approximately $532,731 to Rowberrow on or about January 5, 2009, approximately $533,635 to Northwestern on or about January 8, 2009 and approximately $533,634 to Bradleyville that same day.  These amounts were fraudulently transferred from a Receivership Entity to Beracha's entities.

## XIII.   Investments in the Master Fund

138.    On or about December 31, 2008, HVP Partners issued a $5,000,000 promissory note for a term of six months with an usurious interest rate of 42% to Beracha and a $20,000,000 promissory note for a term of six months with an interest rate of 42% to Rowberrow, which both

represent an annualized rate of 84%. Both notes came due on June 30, 2009. In exchange, Master Fund received $25,000,000 in Venezuela Republic Global Bonds with a nominal value of $42,145,000 from Beracha and Victor Vargas, his business partner.

139.    With respect to repayment of the $5,000,000 note, MK Consulting paid 4A Star $4,100,000 and HVP Partners issued a note to Ponter Investments in the amount of $3,000,000 at 3% interest and directed Ponter to pay the $3,000,000 directly to 4A Star on its behalf.

140.    With respect to repayment of the $20,000,000 note, MKV repaid Rowberrow for the note and the 42% interest, totaling $20,226,552 on or about July 1, 2009.

141.    On or about the same day, HVP Partners issued a promissory note to BCT Bank in the amount of $11,943,500 of which, and upon information and belief, BCT Bank paid Seadone, a Vargas entity, the amount of $8,173,478, representing Vargas's portion of the note and interest due.

142.    Upon information and belief, Seadone was repaid instead of a Beracha entity because Vargas initially contributed approximately $5,763,014 worth of the bonds to the Master Fund, and was entitled to receive a portion of the repayment of the promissory notes.

143.    Rowberrow and 4A Star received fraudulent transfers associated with this transaction in the amount of approximately $8,089,536 to the detriment of the Receivership Entities.

## XIV.   Beracha Bond Transaction with the Master Fund and Related Fees

144.    Upon information and belief, on or about February 6, 2009, Northwestern transferred approximately $9,819,136 worth of Venezuela bonds to the Master Fund. These bonds had a nominal value of $17,662,000.

145.    Upon information and belief, this transfer was in return for a note with a term of six months and an interest rate of 42% that Illarramendi issued to entities affiliated with Beracha, which represents an annualized rate of 84%.

146.    On or about August 13, 2009, MKV transferred $14,200,000 to 4A Star which, upon information and belief, was in repayment for the note, plus interest.

147.    Upon information and belief, in addition to the exorbitant interest, another Beracha entity received a fee or kickback for entering into this transaction as, on or about February 12, 2009, the Master Fund transferred another $960,000 to La Signoria (which the Receiver is not seeking at this time).

148.    In total, Beracha entities received fraudulent transfers totaling $4,380,864 in the form of interest and fees.  Such payments would have raised a red flag for Beracha and demonstrates his bad faith given that his entities provided bonds to the Master Fund, yet a different Beracha entity was paid back by MKV, a Receivership Entity.

**XV.    Subscriptions in MKV**

149.    In or about April 2009, Illarramendi was in the process of creating the MKV and needed subscriptions.  Upon information and belief, Illarramendi agreed to give Beracha a percentage of the overall subscriptions in MKV in exchange for his assistance in soliciting investors.

150.    In addition to that windfall, upon information and belief, Beracha caused Fractal P Holding also invested in MKV.  Upon information and belief, on or about April 22, 2009, Fractal P Holding, to invest $25,000,000 in MKV.  Upon information and belief, in order to encourage this investment, Illarramendi agreed to pay 10% of MKAM's fee for managing MKV to Fractal Fund.

151.    Upon information and belief, on November 18, 2009, MKV made a $1,875,000 dividend payment to Fractal P Holding, which was followed by another dividend payment on April 28, 2010 in the amount of $1,718,750 to Fractal Fund.

152.    Thereafter, upon information and belief, on or about April 30, 2010, SOF invested $20,000,000 in Fractal Factoring II and received shares.

153.    In or around July 2010, upon information and belief, MKV was winding down and being liquidated.  Upon information and belief, as partial payment for the redemption of Fractal P Holdings shares in MKV, SOF transferred the shares in Fractal Factoring II to Fractal Fund or one of its affiliated entities.

154.    Upon information and belief, to finish the redemption for the $25,000,000 investment in MKV, on or about July 9, 2010, MKV paid Fractal Fund $5,156,280.

155.    In sum, for Fractal's investment, Fractal Fund and Fractal P. Holding were unjustly enriched by $3,750,030, which was the exact amount Illarramendi had promised to return on the investment.

156.    Beracha's unjust enrichment and receipt of fraudulent transfers based on the formation of MKV did not end there.  Upon information and belief, on or about June 1, 2009 Sunny Services made a subscription in MKV by transferring $4,491,599 in Venezuela bonds with a nominal value of $6,710,000.

157.    Thereafter MKV paid Sunny Services dividend payments of $558,463 on or about December 11, 2009 and $511,927 on or about April 26, 2010.

158.    Upon information and belief, on or about July 14, 2010, MKV paid Sunny Services $4,700,172 to redeem the investment.  Accordingly, Sunny Services received fictitious profits totaling $1,278,963.

159.    Finally, on or about March 15, 2010, STLF issued a credit-linked note to Fractal Fund in the amount of $15,000,000.  In return, upon information and belief, on or about March 19, 2010, Fractal Fund transferred $15,000,000 to MKV.

160.    Thereafter, upon information and belief, in repayment of this purported credit linked note, STLF paid Fractal Fund $15,431,280 on or about July 9, 2010.  Fractal Fund received fictitious profits totaling $431,280.

161.    In sum, Fractal Fund and Fractal P Holding received fraudulent transfers over and above their investments in the amount of approximately $4,181,400.

162.    Beracha's unjust enrichment and receipt of fraudulent transfers did not end with his side payments for the various subscriptions.  His agreement with Illarramendi also entitled him to a percentage of the *overall* subscriptions in MKV.

163.    Upon information and belief, these percentages were paid by MKV at various times in 2009 and 2010.

164.    On or about May 5, 2009, MKV paid Rowberrow $11,126,479 and La Signoria $2,422,799 as "commissions" for the total amount of MKV subscriptions.  Thereafter, on or about December 4, 2009, MKV paid Rowberrow another $313,061 for "commissions" based on MKV subscriptions.  Then, on or about January 29, 2010, MK Capital Management paid Rowberrow another $827,314 for "commissions" based on MKV subscriptions.

165.    Finally, it came time for Illarramendi to liquidate MKV, but he still owed Beracha and Rowberrow money based on the overall MKV subscriptions.  Upon information and belief, these remaining amounts owed were paid to Rowberrow by MKV on May 4, 2010 and May 18, 2010 totaling $7,365,396.

166.    In sum, Rowberrow was unjustly enriched for MKV subscriptions in the amount of $19,632,250.  These payments are completely unjustified and, in fact were kept secret from Odo Habeck, a principal of MKAM.  When Illarramendi formed MKV, he went so far as to email Beracha on or about April 19, 2009 and reminded Beracha not to talk with Habeck about the additional fees Illarramendi agreed to pay Beracha, stating:

> Nonetheless, I would appreciate it if you could tell Alain [a Fractal executive] that we will talk tomorrow to square everything up, BUT (emphasis in original) that if operatively he has to speak with Odo Habeck, tell him not to discuss anything about the upfronts with Odo, only with me.  With Odo he should only talk about the normal investment of $25 million.  I will handle the rest.  Please confirm this with me.

167.    Collectively, upon information and belief, Fractal Fund, Fractal P Holding, Sunny Services, La Signoria, and Rowberrow received fraudulent transfers totaling $27,515,411 which astoundingly totals approximately 25% of the total subscriptions in MKV.

## XVI.   $20,000,000 Promissory Note

168.    On or about September 1, 2009, HVP Partners gave Rowberrow a $20,000,000 promissory note for a term of four months with an interest rate of 20% which represents an annualized rate of 60%.  On or about three days later, September 4, 2009, Rowberrow paid MK Consulting $20,000,000.

169.    Thereafter, upon information and belief, on January 8, 2010, in repayment of the note plus interest, the Master Fund paid Rowberrow $24,000,000.  Upon information and belief, this $24,000,000 was funded by amounts previously transferred from SOF to the Master Fund.

170.    Based on this payment, Rowberrow was unjustly enriched by $4,000,000.   This payment is significant as Beracha should have recognized that repayment from an entity different from that to which he loaned the money was a red flag indicating Illarramendi's illegitimate business operations.

37

**XVII.  $25,000,000 Promissory Note and Redemption**

171.    Upon information and belief, on or about September 1, 2009, HVP Partners gave Rowberrow a promissory note for a term of four months with an interest rate of 20% which represents an annualized rate of 60%.   In turn, upon information and belief, on or about September 23, 2009, 4A Star provided MKV with approximately $23,200,000.

172.    Thereafter, in an effort to repay the promissory note, upon information and belief, the Master Fund, on or about January 8, 2010, paid 4A Star approximately $10,000,000 and on or about January 11, 2010, SOF paid 4A Star approximately $20,000,000.

173.    Not only did 4A Star profit on the repayment from the Master Fund and SOF, but it had only provided MKV with approximately $23,200,000 on the $25,000,000 note.  Therefore, 4A Star has been unjustly enriched by approximately $6,800,000.

174.    More importantly, the repayment structure would have raised a red flag for Beracha, Rowberrow, and 4A Star as Rowberrow received a promissory note with an excessive interest rate, 4A Star transferred money to MKV and then was repaid by two completely different funds, Master Fund and SOF.

**XVIII. Rowberrow's Receipt of $25,000,000 Promissory Note at 12%**

175.    On or about March 10, 2010, Beracha-affiliated entities 4A Star and Bradleyville transferred $8,825,000 each to MKV.  The following day, another Beracha entity, Rowberrow, gave a $4,000,000 promissory note to a third party that, in turn, gave $4,000,000 to MKV.  The payments to MKV totaled $21,650,000.

176.    Upon information and belief, these payments to MKV were in consideration for a $25,000,000 credit-linked note with an interest rate of 12% from STLF to Rowberrow.

177.    On June 16, 2010 and July 7, 2010, STLF made two different payments to Rowberrow of $14,000,000 each.  Therefore, upon information and belief, Rowberrow received

$6,350,000 in fraudulent transfers and more importantly, Rowberrow and Beracha should have recognized that return on transfers made to MKV by 4A Star and Bradleyville and paid back to Rowberrow by STLF were not indicative of legitimate trading operations by Illarramendi.

**XIX.   $15,000,000 Credit Linked Note**

178.    On or about March 15, 2010, STLF gave Rowberrow a credit-linked note in the amount of $15,000,000 for a term of 4 months with an interest rate of 16% which represents an annualized rate of 48%.

179.    Upon information and belief, in return for this note, Rowberrow invested $14,100,000 in MKV on or about March 22, 2010.

180.    Subsequently, on or about July 9, 2010, STLF repaid the note plus interest totaling $17,844,444.

181.    Rowberrow was the recipient of fraudulent transfers in the amount of $3,744,444.

**XX.    Rowberrow Receives $6,669,049**

182.    Upon information and belief, on or about July 20, 2010, STLF paid Rowberrow approximately $6,669,049.  Upon information and belief, this payment was made for no reason as Rowberrow provided nothing of value to warrant such a payment.  This fraudulent transfer unjustly enriched Rowberrow to the detriment of STLF, a Receivership Entity.

**The 2011 Collapse**

183.    By 2011, the SEC and FBI were investigating Illarramendi and his operations.  As the government closed in, upon information and belief, Illarramendi was desperate for a way out.  Illarramendi engaged Juan Carlos Horna Napolitano ("Horna") as an intermediary to assist with the creation of a false asset verification letter purporting to verify that STLF was owed money by various Venezuelan companies in order to obstruct the SEC investigation of Illarramendi's fraud and to mislead the court appointed-business advisor for the MK

Entities.  Horna served as a liaison between Illarramendi and an accountant involved in the conspiracy to create the false asset verification letter, and Horna was also responsible with making sure that payments were made to the persons and entities necessary to substantiate the false information in the letter.  Upon information and belief, Illarramendi agreed to pay in excess of $3,000,000 to obtain the false asset verification letter, and Horna requested that Illarramendi make a partial payment for Horna's benefit in the amount of $1.9 million to a bank account in the name of JEISLO Real Estate Investments LLC ("JEISLO").  Horna ultimately pleaded guilty to conspiracy to obstruct the SEC and was sentenced to 14 months in prison.

184.    Upon information and belief, Illarramendi needed a portion of the $3,000,000 payment to be made by a third party as he had insufficient funds.  Upon information and belief, Illarramendi turned to Beracha who made payments to JEISLO through his 4A Star entity.  Upon information and belief, 4A Star paid at least $1,250,000 towards this illegal cause.

## THE TRANSFERS

185.    The transfers by Receivership Entities to 4A Star, Bestinvest, Bradleyville, Brave Spirit, Dobson, East Coast, Fractal Fund, Fractal Factoring, Fractal L Holding, Fractal P Holding, Fractal Factoring II, Hermitage, La Signoria, Netvalue, Northwestern, Rowberrow, and Sunny Services described above are collectively referred to as the "Transfers."  The net transfers, set forth by transaction, are listed on Exhibit 1.

## CLAIMS BY CERTAIN DEFENDANTS

186.    On or about December 23, 2011, 4A Star, through its attorney, filed a claim with the Receiver for $6,250,000 against MKAM.  As the Receiver's investigation is ongoing, the precise manner in which the assets will be distributed to valid claimants, as well as which claims are valid, has yet to be determined.

187.    Through undated claim forms submitted by its attorney, Fractal Fund filed two claims with the Receiver.  One claim was for $60,000,000 against the STLF and the other claim was for $16,000,000 against MKAM.  As the Receiver's investigation is ongoing, the precise manner in which the assets will be distributed to valid claimants, as well as which claims are valid, has yet to be determined.

188.    On or about December 23, 2011, Rowberrow, through its attorney, filed a claim with the Receiver for $30,200,000 against the STLF.  As the Receiver's investigation is ongoing, the precise manner in which the assets will be distributed to valid claimants, as well as which claims are valid, has yet to be determined.

189.    Through an undated claim form submitted by its attorney, Sunny Services filed a claim with the Receiver for $20,000,000 against the STLF.  As the Receiver's investigation is ongoing, the precise manner in which the assets will be distributed to valid claimants, as well as which claims are valid, has yet to be determined.

**THE ONGOING INVESTIGATION**

190.    The Receiver was only able to discover the fraudulent nature of the above-referenced Transfers after Illarramendi and his accomplices were removed from control of the Receivership Entities and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Receivership Entities.  No amount of reasonable diligence by the Receiver could have detected the fraudulent transfers sooner.  The Receiver's investigation is still ongoing.    As a result, there may be evidence of other assets belonging to the Receivership Estate or other fraudulent transfers of funds that the Receiver has yet to discover.  If such transfers or assets are later discovered, the Receiver will seek to amend this Complaint to assert claims regarding such transfers or assets.

191.     To the extent that any of the recovery counts below may be inconsistent with each other, they are to be treated as pleaded in the alternative.

**FIRST CAUSE OF ACTION**
**CUFTA SECTION 52-552E(A)(1) (ACTUAL FRAUD)**
*As To All Defendants*

192.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

193.     The Transfers were (a) made on or within four years before the date of this action or (b) were discovered within one year of when the fraudulent transfers could have been reasonably discovered by the Receiver.

194.     At the time of each of the Transfers, one or more of the Receivership Entities were each "creditors" within the meaning of section 52-552(b)(4) of CUFTA.

195.     Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552(b)(12) of CUFTA.  All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.  Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

196.     Each of the Transfers was to, or for the benefit of, the Defendants.

197.     Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

198.     Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

199.    Each of the Transfers were made by Illarramendi and others to further the Ponzi scheme and were made with the actual intent to hinder, delay or defraud some or all of the Receivership Entities' then-existing creditors.

200.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(1) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

201.    As a result of the foregoing, pursuant to sections 52-552e(a)(1) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## SECOND CAUSE OF ACTION
## CUFTA SECTION 52-522E(A)(2) (CONSTRUCTIVE FRAUD)
### *As To All Defendants*

202.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

203.    The Receiver seeks to avoid those Transfers that were made on or within four-years before the date of this action.

204.    Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552(b)(12) of CUFTA.  All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.  Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

205.    Each of the Transfers was to, or for the benefit of, the Defendants.

206.    Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

207.    Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

208.    At the time of each of the Transfers, the Receivership Entities were insolvent, were engaged in a business or transaction, or was about to engage in a business or a transaction, for which any property remaining with the Receivership Entities was an unreasonably small capital.

209.    At the time of each of the Transfers, the Receivership Entities intended to incur, or believed that they would incur, debts that would be beyond its ability to pay as such debts matured.

210.    The Transfers were not made by the Receivership Entities in the ordinary course of business.

211.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552e(a)(2) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

212.    As a result of the foregoing, pursuant to sections 52-552e(a)(2) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within four-years before the date of this action; and (ii) recovering the Transfers made on or within four-years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

**THIRD CAUSE OF ACTION**
**CUFTA SECTION 52-522F(A) (CONSTRUCTIVE FRAUD)**
*As To All Defendants*

213.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

214.    The Receiver seeks to avoid those Transfers that were made on or within four-years before the date of this action.

215.    Each of the Transfers constitutes a transfer of an interest of property of the Receivership Entities within the meaning of section 52-552(b)(12) of CUFTA.   All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.   Accordingly, multiple Receivership Entities are creditors within the meaning of section 52-552(b)(4) of CUFTA for the various Transfers alleged herein.

216.    Each of the Transfers was to, or for the benefit of, the Defendants.

217.    Each of the Transfers was made with money misappropriated from Receivership Entities.   At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

218.    Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

219.    At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the transfer in question.

220.    The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to section 52-552f(a) of CUFTA and recoverable from the Defendants pursuant to section 52-552h of CUFTA.

221.    As a result of the foregoing, pursuant to sections 52-552f(a) and 52-552h of CUFTA, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within four-years before the date of this action; and (ii) recovering the Transfers made on or within four-years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

## FOURTH CAUSE OF ACTION
## COMMON LAW FRAUDULENT TRANSFER
*As To All Defendants*

222.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

223.    The Receiver seeks to recover those Transfers that occurred on or within three-years before the date of this action.

224.    At the time of each of the Transfers, one or more of the Receivership Entities were creditors.

225.    Each of the Transfers constitutes a transfer of an interest of property of Receivership Entities.  All of the Transfers occurred during the course of a Ponzi scheme, when investor money was commingled and all Receivership Entities were insolvent.  Accordingly, multiple Receivership Entities are creditors for the various Transfers alleged herein.

226.    Each of the Transfers was to, or for the benefit of, the Defendants.

227.    Each of the Transfers was made with money misappropriated from Receivership Entities.  At all relevant times herein, the Receivership Entities had a claim to the funds used for the Transfers.

228.    Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

229.   At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the transfer in question.

230.   The Transfers constitute fraudulent transfers avoidable by the Receiver and recoverable from the Defendants.

231.   As a result of the foregoing, the Receiver is entitled to a judgment: (i) avoiding and preserving the Transfers made on or within three years before the date of this action; and (ii) recovering the Transfers made on or within three years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
*As To All Defendants*

232.   The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

233.   The Defendants each benefited from the receipt of money from the Receivership Entities in the form of loans, payments, bonuses, compensation, and other Transfers alleged herein which were the property of the Receivership Entities and their investors, and for which the Defendants did not adequately compensate the Receivership Entities or provide value.

234.   The Defendants unjustly failed to repay the Receivership Entities for the benefits they received from the Transfers.

235.   The enrichment was at the expense of the Receivership Entities and, ultimately, at the expense of their creditors.

236.   Equity and good conscience require full restitution of the monies received by Defendants from the Receivership Entities for distribution to the creditors.

237.    Beracha's conscious, intentional, and willful tortious conduct alleged herein entitles the Receiver to recapture profits derived by the Defendants from utilizing monies they received from Receivership Entities.

238.    By reason of the above, the Receiver, on behalf of the Receivership Entities and its creditors, is entitled to an award in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**<u>CONVERSION</u>**
*As To All Defendants*

239.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

240.    The Receivership Entities had a possessory right and interest to its assets.

241.    The Defendants converted the assets of Receivership Entities when they received money originating from Receivership Entities in the form of loans, bonus payments, and other transfers.  These actions deprived the Receivership Entities and their creditors of the use of this money.

242.    As a direct and proximate result of this conduct, the Receivership Entities and their creditors have not had the use of the money converted by the Defendants.

243.    By reason of the above, the Receiver, on behalf of the Receivership Entities, is entitled to an award of compensatory damages in an amount to be determined at trial.

244.    Beracha's conscious, willful, wanton, and malicious conduct entitles the Receiver, on behalf of the Receivership Entities and their creditors, to an award of punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
## CONSTRUCTIVE TRUST
### *As To All Defendants*

245.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

246.    As alleged herein, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers, unfair trade practices, unjust enrichment, conversion, breaches of fiduciary duty, and other wrongdoing of Beracha for the Defendants' individual interests and enrichment.

247.    The Receiver has no adequate remedy at law.

248.    Because of the past unjust enrichment and the fraudulent transfers made to the Defendants, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from Receivership Entities, as well as to any profits received by the Defendants in the past or on a going forward basis from transfers derived from the Receivership Entities.

249.    The Receiver is entitled to and demands title, possession, use and/or enjoyment of the foregoing property for the benefit of the Receivership Estate.

## EIGHTH CAUSE OF ACTION
## ACCOUNTING
### *As To All Defendants*

250.    The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

251.    As set forth above, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers, breaches of fiduciary duties, conversion, and other wrongdoing of the Defendants for their own individual interests and enrichment.

252.    The Receiver has no adequate remedy at law.

49

253.     To compensate the Receivership Entities for the amount of monies the Defendants diverted from Receivership Entities for their own benefit, it is necessary for the Defendants to provide an accounting of any transfer of funds, assets, or property received from the Receivership Entities, as well as to any profits in the past and on a going forward basis in connection with Receivership Entities.  Complete information regarding the amount of such transfers misused by the Defendants for their own benefit is within their possession, custody, and control.

## NINTH CAUSE OF ACTION
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### *As To Beracha*

254.     The Receiver incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

255.     From the beginning of the fraudulent scheme, Beracha materially and knowingly aided Illarramendi by furnishing the indispensable instrumentalities to support and perpetuate it – Beracha and his entities' money, his access to even more money from investors he helped Illarramendi recruit for the MK Funds and HVP Funds, which they looted together, and his aid in bribing at least one Venezuelan official.

256.     Beracha's extraction of exorbitant and outlandish rates of interest and other direct and indirect payments from the MK Funds and HVP Funds, his knowing facilitation of bribery, his complete disregard for all corporate formalities and arm's length dealing when transacting with Illarramendi and the Receivership Entities, and the many other wrongful acts detailed above, demonstrate that Beracha knew of Illarramendi's illegal and tortious conduct.

257.     During and in each of the transactions described above, Illarramendi was a dominant and controlling owner of the Receivership Entities, served as their agent, and owed a

high fiduciary duty to the Receivership Entities to act in their best interest pursuant to a strict duty of loyalty, care, good faith and fair dealing.

258.   By his looting, diversion, misappropriation, mismanagement, dissipation and waste of corporate assets, his self-dealing, and his engaging in the other wrongful acts and failures to act described above,   Illarramendi clearly breached his fiduciary duty to the Receivership Entities.

259.   As a direct and proximate result of Illarramendi's breaches of fiduciary duty, the Receivership Entities were damaged.

260.   Beracha knew that Illarramendi was a fiduciary and owed a fiduciary duty to the Receivership Entities.

261.   Beracha knowingly and substantially participated in, and aided and abetted, Illarramendi's breaches of duty.

262.   By reason of the above, the Receiver, on behalf of the Receivership Entities is entitles to an award of compensatory and punitive damages in an amount to be determined at trial.

**WHEREFORE**, the Receiver respectfully requests that this Court enter judgment in favor of the Receiver and against Defendant(s) as follows:

i.   On the First Cause of Action; pursuant to sections 52-552e(a)(1) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers; and (ii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

ii.   On the Second Cause of Action; pursuant to sections 52-552e(a)(2) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers made on

or within four years before the date of this action; and (ii) recovering the Transfers made on or within  four years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

       iii.      On the Third Cause of Action; pursuant to sections 52-552f(a) and 52-552h of the Connecticut Fraudulent Transfers Act: (i) avoiding and preserving the Transfers made on or within four years before the date of this action; and (ii) recovering the Transfers made on or within four years before  the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

       iv.      On the Fourth Cause of Action; pursuant to Connecticut common law, (i) avoiding and preserving the Transfers made on or within three years before the date of this action; and (ii) recovering the Transfers made on or within three years before the date of this action, or the value thereof, from the Defendants for the benefit of the Receivership Estate;

       v.      On the Fifth Cause of Action against each of the Defendants for unjust enrichment and for damages in an amount to be determined at trial;

       vi.      On the Sixth Cause of Action against each of the Defendants for conversion, for damages in an amount to be determined at trial;

       vii.      On the Seventh Cause of Action against each of the Defendants for imposition of a constructive trust upon any transfer of funds, assets, or property received from the Receivership Entities;

       viii.      On the Eighth Cause of Action against each of the Defendants for an accounting of any transfer of funds, assets, or property of the Receivership Entities;

       ix.      On the Ninth Cause of Action against Beracha for aiding and abetting breach of fiduciary duty, for damages in an amount to be determined at trial;

   x.  On all Causes of Action, awarding the Receiver all applicable pre-judgment and post-judgment interest, costs, and disbursements of this action; and

   xi.  On all Causes of Action, granting the Receiver such other, further, and different relief as the Court deems just, proper and equitable.

The Receiver respectfully requests a jury trial for all of the preceding causes of action.

Date:  February 3, 2012

                _/s/  Philip H. Bieler_
                **BAKER & HOSTETLER LLP**
                45 Rockefeller Plaza
                New York, NY 10111
                Tel: (212) 589-4200
                Fax: (212) 589-4201
                Philip H. Bieler
                Email: pbieler@bakerlaw.com
                Jonathan B. New
                Email: jnew@bakerlaw.com

                *Attorneys for Receiver John J. Carney, Esq.*

OF COUNSEL
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Tel: (212) 589-4200
Fax: (212)589-4201
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Jessica Schichnes
Email: jschichnes@bakerlaw.com